**AFFIDAVIT**
**of**
**STACY R. BANKS**
**SPECIAL AGENT**
**FEDERAL BUREAU OF INVESTIGATION**

I, Stacy R. Banks, being duly sworn, do hereby depose and state as follows:

1.        I am a Special Agent ("SA") with the Federal Bureau of Investigation (FBI) and am assigned to the Jefferson City, Missouri Office.  I have been an SA with the FBI for approximately seventeen (17) years.  In the course of my career, I have participated in numerous investigations concerning violations of Title 18 and 21, United States Code.  I am currently assigned to criminal investigations involving white collar crimes and narcotics investigations.  I have gained expertise in the conduct of such investigations through training in seminars, classes and everyday work related to these types of investigations.  I have been personally involved in investigations involving the interception of numerous parcels which were found to contain narcotics and/or proceeds of narcotics trafficking and other criminal activity.  I have also conducted and assisted with investigations regarding computers, cell phones, and other related electronic storage devices and their use to commit and/or further crimes.  I have also been involved in the execution of search warrants to search residences and seize digital evidence including, but not limited to, computers, cell phones, and other related electronic storage devices.

2.        This affidavit is made in support of an application for a search warrant for information associated with one Instagram account ("Target Account"), as described below, that is stored at premises owned, maintained, controlled or operated by Instagram, LLC ("Instagram"), a social-networking company owned by Meta Platforms, Inc., doing business as Meta and formerly known as Facebook, Inc. and headquartered in Menlo Park, California ("Meta").  The information to be searched is described in the following sub-paragraphs.  This affidavit is made in support of applications for search warrants under 18 U.S.C. Sections 2703(a), (b)(1)(A), and (c)(1)(A), to

require Instagram to disclose to the Government records and other information in its possession, including the contents of the communications, pertaining to the subscriber(s) and/or customer(s) associated with the Target Account: All information associated with Instagram username "a1empire_ceo" that is stored at premises owned, maintained, controlled or operated by Instagram, a company that is owned by Meta and headquartered in Menlo Park, California.

3. The information in this affidavit is based on my personal knowledge, information provided to me by other law enforcement officers and other persons. In the course of preparing this affidavit and conducting the present investigation, I have consulted with agents and investigators with specialized training and experience in digital evidence and forensics. The information in this affidavit is submitted for the limited purpose of establishing probable cause in connection with the present application and is not intended as a complete statement of all facts related to this investigation.

4. Based upon my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18, U.S.C. Section 1343, wire fraud, have been committed by Lawrence Lawhorn, Tina Battie, Latoya Brown, Lauren Luque, and others known and unknown. There is probable cause to search the Target Account for evidence of these crimes and items to be seized as listed in Attachment A.

<u>**Jurisdiction**</u>

5. This court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. Section 2711, 18 U.S.C. Sections 2703(a), (b)(1)(A) and (c)(1)(A). Specifically, the Court is "a district court of the United States…that has jurisdiction over the offense being investigated." 18 U.S.C. Section 2711(3)(A)(i)..

2

## Probable Cause

6.    On August 15, 2020, Special Agents from the FBI and the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) executed a federal arrest warrant for Lawhorn related to a complaint filed charging Lawhorn with Conspiracy to Commit Wire and Mail Fraud in relation to an investigation into staged automobile accidents.  Lawhorn was turned over to the custody of the United States Marshal Service.  At the time of Lawhorn's arrest, an iPhone and a MacBook laptop were in Lawhorn's immediate possession and were seized from Lawhorn.

7.    As part of the wire and mail fraud investigation, federal search warrants (numbers 20-3050-SW-WJE and 20-3051-SW-WJE) were obtained by the FBI to search the contents of the iPhone and MacBook laptop that were seized from Lawhorn upon his arrest.  On August 21, 2020, I executed the search warrant for the iPhone (20-3050-SW-WJE) by providing a copy of it to Detective Cody Bounds with the Boone County Sheriff's Department Cyber Crimes Unit for analysis.

8.    Detective Bounds analyzed the iPhone pursuant to the search warrant.  On or about September 30, 2020, Detective Bounds provided me with a Cellebrite report containing information on the phone related to mail and wire fraud.  According to a review of the Cellebrite report, the phone number for the iPhone was 314-724-1457 and the Apple ID attached to the phone was truemcallistermovie@gmail.com.

9.    On or about August 31, 2020, I obtained a federal grand jury subpoena issued to AT&T for the subscriber information for the phone number 314-724-1457.  No subscriber information was provided by AT&T.  However, as part of the investigation of Lawhorn which resulted in charges being filed for the case United States v. Lawhorn, et al, 20-04071-01/19-CR-C-RK, I obtained an insurance claim file from Prime Insurance in relation to an automobile

3

accident that occurred on February 3, 2020 in which Lawhorn was involved. According to the claim files notes, a Prime Insurance employee documented that she spoke to Lawrence Lawhorn on telephone number 314-724-1457 on August 7, 2020 in relation to the insurance claim.

10. On or about November 13, 2020, I obtained a federal grand jury subpoena issued to Google, LLC for the subscriber information for the e-mail account truemcallistermovie@gmail.com. Google, LLC provided the subpoena compliance and reported that the name on the e-mail account for truemcallistermovie@gmail.com was Courtney McAllister.

11. On or about November 30, 2020, I reviewed an Instagram account with the username "moremcallister". The vanity name on the Instagram account was listed as "Courtney McAllister". I know through this investigation that Courtney McAllister is a name commonly used by Lawhorn. There were videos and pictures containing Lawhorn posted to this Instagram account. I observed that there was a post made to this Instagram account on November 24, 2020, over three months since Lawhorn was arrested and detained. The post had a picture of Lawhorn and another male in a car. The post read, "THEY SCREAMIN "FREE COURTNEY TILL THE FEDS FINALLY DO SO".

12. I reviewed the Cellebrite report for the iPhone seized from Lawhorn upon his arrest and observed that the user of the iPhone exchanged numerous text messages with various people utilizing the TextNow app under the username "winsorsmith". The TextNow app account was created on June 19, 2020, and was assigned the phone number 314-500-8995.

13. I reviewed the Cellebrite report for the iPhone seized from Lawhorn upon his arrest and observed that the user of the iPhone exchanged numerous text messages through the TextNow

app under the username "winsorsmith" with the following phone numbers during the respective periods listed:

    a.    773-310-1865 (6/23/2020 – 7/26/2020),

    b.   573-318-1628 (6/23/2020 – 7/26/2020),

    c.   816-673-5518 (6/23/2020 – 7/27/2020)

    d.   305-923-6125 (6/19/2020 – 7/28/2020), and

    e.   573-823-6852 (6/19/2020 – 7/28/2020).

14.      According to a review of the Target Account, a post to the Instagram account on May 19, 2019 had a picture of a business card with the name Tina Battie listed as A1Empire Inc CEO, Credit Repair Specialist for A1 Empire Inc. and the business card included the phone number 773-310-1865 on it.

15.      From information obtained during the investigation of Lawhorn which resulted in charges being file for the case United States v. Lawhorn, et al, 20-04071-01/19-CR-C-RK, the phone number 573-318-1628 was utilized by Michael Stapleton, 816-673-5518 was utilized by Latoya Brown, 305-923-6125 was utilized by Lauren Luque, and 573-823-6852 was utilized by Kathy Kimhang, all co-defendants in the case.

16.      I reviewed the Target Account and observed a post-dated April 4, 2020 that had a screen shot of the U.S. Small Business Administration's website for the COVID-19 Economic Injury Disaster Loan Application.  The caption to the post read, "Disaster loans available for small businesses! GO APPLY NOW!!!".

17.      Upon further review of the Cellebrite report from the iPhone seized from Lawhorn, I observed a string of text messages from the TextNow app between the user of the iPhone and the phone number 773-310-1865 on June 23, 2020 that read as follows:

a. One picture was sent from TextNow user "winsorsmith" to 773-310-1865 that contained the words "Michael Leegene Stapleton 3/19/1986 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 2300 Sears Court Apt#4 Columbia mo 65202 Account #1000000154936 Routing #28150417"

b. The user of phone number 773-310-1865 responded to "winsorsmith" with a text that read, "Email".

c. The TextNow user "winsorsmith" responded with a text that read, "Create emails for em and just write the passwords down."

d. The user of the phone number 773-310-1865 responded to "winsorsmith" with a text message that read, "Ok".

e. The TextNow user "winsorsmith" responded to the phone number 773-310-1865 with a text that contained a picture that contained the words, "*Latoya Marie Brown 9/9/1985 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 16800 E. Larkspur Lane Independence Mo 64055 071025661 4824457440".

f. The user of the phone number 773-310-1865 sent a text message to "winsorsmith" that read, "What bank Toya with".

g. The user of the phone number 773-310-1865 sent a text message to "winsorsmith" containing a picture of a confirmation for an Economic Injury Disaster Loan.

h. The TextNow user "winsorsmith" responded to the phone number 773-310-1865 with a text that contained a picture that contained the words, "*Matthew Stephen Akins 14195 Old Highway 66 St. James MO 65559 09/22/1988 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 Account #756639 Routing #081501696 (The Callaway Bank).

6

18.     Upon further review of the Cellebrite report from the iPhone seized from Lawhorn, I observed a string of text messages from the TextNow app between the user of the iPhone and the phone number 773-310-1865 on June 24, 2020 that read as follows:

a.    The TextNow user "winsorsmith" sent a text message to the phone number 773-310-1865 that contained a picture that contained the words, "Kathy Davy kimhang 04/04/1991 4202 Langham drive 65202 Columbia mo 65202 SSN 025747427 128078908 account number 081004601 routing Central Bank of Boone County".

b.    The TextNow user "winsorsmith" sent a text message to the phone number 773-310-1865 that contained a picture that contained the words, "Tiera Ra'Chell Wallace 1/20/1992 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 210 Anita Court Columbia mo 65201 Account #9203141350 Routing #107001481 Academy Bank".

c.    The user of the phone number 773-310-1865 responded to "winsorsmith" with a text message that read, "ok".

d.    The user of the phone number 773-310-1865 sent a text message to "winsorsmith" containing a picture of a confirmation for an Economic Injury Disaster Loan.

e.    The TextNow user "winsorsmith" sent a text message to the phone number 773-310-1865 that read, "Can you send me a list of all the names youve completed so far, so I can know who else and what else to send you".

f.    The user of the phone number 773-310-1865 responded to "winsorsmith" with a text message that read, "I sent you all their Confirmation".

g.    The TextNow user "winsorsmith" responded to the phone number 773-310-1865 with a text message that read, "Ik but not in the phone that's with me".

7

h.  The user of the phone number 773-310-1865 responded to "winsorsmith" with a text message that read, "Matthew Kathy Tiera Lanay Michael Latoya".

19.  Upon further review of the Cellebrite report from the iPhone seized from Lawhorn, I observed a string of text messages from the TextNow app between the user of the iPhone and the phone number 773-310-1865 on June 25, 2020 that read as follows:

a.  The TextNow user "winsorsmith" sent a text message to the phone number 773-310-1865 that read, "I thought I sent you 9 ppls info but on the list of completed there's only 6, who am I missing so I can make sure you have completed info ?".

b.  The user of the phone number 773-310-1865 responded to "winsorsmith" with a text message that read, "No you sent me 6 plus your self 7".

c.  The user of the phone number 773-310-1865 sent a text message to "winsorsmith" that read, "Let me go in my email and send you the list again".

d.  The user of the phone number 773-310-1865 sent a text message to "winsorsmith" that read, "Lanay Wallace Michael Stapleton Latoya Brown Kathy Kimhang Matthew Akins Tiera Wallace".

e.  The TextNow user "winsorsmith" responded to the phone number 773-310-1865 with text messages that read, "I sent you Marquez lawhorn too" and "And sending Apple today shortly".  I know from the investigation that Lawhorn calls Lauren Luque by the name "Apple".

f.  The user of the phone number 773-310-1865 responded to "winsorsmith" with a text message that read, "No I didn't get Marquez".

g.  The TextNow user "winsorsmith" responded to the phone number 773-310-1865 with a text message that contained a picture that contained the words, "Marquez

8

Lonelle Lawhorn 7/3/1979 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 705 McBaine Ave Columbia Ave 65202 Account #9310402343 Checking: 9210544806 Academy Bank (5733038979)".

h. The TextNow user "winsorsmith" sent a text message to the phone number 773-310-1865 that contained a picture that contained the words, "Lauren Courtney Luque SSN? 3/10/86? 4010 W Broadway Columbia Mo 65202 Account #003266782210 Routing #061000062 Bank Of America".

i. The user of the phone number 773-310-1865 sent a text message to "winsorsmith" that contained a picture of a confirmation number for an Economic Injury Disaster Loan.

20. Upon further review of the Cellebrite report from the iPhone seized from Lawhorn, I observed a string of text messages from the TextNow app between the user of the iPhone and the phone number 773-310-1865 on June 28, 2020 that read as follows:

a. The user of the phone number 773-310-1865 sent a text message to "winsorsmith" that read, "Toya should have hers soon".

b. The TextNow user "winsorsmith" responded to the phone number 773-310-1865 with a text message that read, "Ok I'll check everything tomorrow".

21. Upon further review of the Cellebrite report from the iPhone seized from Lawhorn, I observed a string of text messages from the TextNow app between the user of the iPhone and the phone number 773-310-1865 on June 29, 2020 that read as follows:

a. The TextNow user "winsorsmith" sent a text message to the phone number 773-310-1865 that read, "Toyas landed. I'll have her send you money today".

b. The TextNow user "winsorsmith" sent a text message to the phone number 773-310-1865 that read, "Ima send you more names today".

9

c. The user of the phone number 773-310-1865 responded to "winsorsmith" with a text message that read, "Ok wya".

d. The user of the phone number 773-310-1865 sent text messages to "winsorsmith" that read, "Try to Make some deposits to your checking account just to have some activities" and "Get Michael email password so I can check it".

e. The user of the phone number 773-310-1865 sent text messages to "winsorsmith" that read, "Toya was able to send 4000, she will send the other 1000 tomorrow" and "Kathy should have hers soon".

22. Upon further review of the Cellebrite report from the iPhone seized from Lawhorn, I observed a string of text messages from the TextNow app between the user of the iPhone and the phone number 773-310-1865 on June 30, 2020 that read as follows:

a. The user of the phone number 773-310-1865 sent a text message to "winsorsmith" that read, "$A1Empire". From my experience, I know this to be a "cashtag" or username for the CashApp which you need to have in order to send someone money through the app.

b. The user of the phone number 773-310-1865 sent a text message to "winsorsmith" that read, "And hurry up so I can send this money cash app. I don't like holding money in there, they be stealing".

c. The TextNow user "winsorsmith" responded by sending a text message to the phone number 773-310-1865 that read, "She sending the request now".

d. The user of the phone number 773-310-1865 sent a text message to "winsorsmith" that read, "Did u check and see if Kathy got hers".

10

e. The TextNow user "winsorsmith" responded by sending text messages to the phone number 773-310-1865 that read, "No she hasn't yet" and "Do I need to check my account??".

f. The user of the phone number 773-310-1865 responded by sending text messages to "winsorsmith" that read, "Yea check and why u at it set up your own Zelle and cash app" and "My fee 3k for the rest".

g. The TextNow user "winsorsmith" responded by sending a text message to the phone number 773-310-1865 that read, "Nowww you rate switching on me? And ok I'll cash app the additional 100 back".

h. The user of the phone number 773-310-1865 responded by sending a text message to "winsorsmith" that read, "No u the one who said 3K".

i. The TextNow user "winsorsmith" responded by sending a text message to the phone number 773-310-1865 that read, "Ik you ain't worried about no 100 dollars and if you want me to give you 3 I will, ppl are just not as willing to take only 1000 so I'll give 2 grand or if family 2500, but you know me and you and never gone have no money disputes so if you saying I need to make it 3 then I will."

j. The user of the phone number 773-310-1865 responded to "winsorsmith" by sending text messages that read, "No my fee 2k I was just saying what you said" and "Is her cash app new?".

k. The TextNow user "winsorsmith" responded by sending a text message to the phone number 773-310-1865 that read, "No it's not. And should I check with other to if any has come".

11

l.   The user of the phone number 773-310-1865 responded to "winsorsmith" by sending text messages that read, "Yes", "I need Michael email password to see if he got an email from them. I will check everybody else email again before I leave", and "Just checked Apple's, she should have hers soon too".

23.   Upon further review of the Cellebrite report from the iPhone seized from Lawhorn, I observed a string of text messages from the TextNow app between the user of the iPhone and the phone number 773-310-1865 on July 1, 2020 that read as follows:

a.   The user of the phone number 773-310-1865 sent a text message to "winsorsmith" that read, "He with callaway bank right?".

b.   The TextNow user "winsorsmith" responded by sending text messages to the phone number 773-310-1865 that read, "Yes", "No money in yhere", and "There".

c.   The user of the phone number 773-310-1865 responded by sending a text message to "winsorsmith" that read, "No if it did I was going to tell my brother to open an account there".

d.   The TextNow user "winsorsmith" sent text messages to the phone number 773-310-1865 that read, "Next few step. We need to get wayyyyyyy more names turned in asap" and "I don't think that ppl are getting in trouble except for ppp".

e.   The user of the phone number 773-310-1865 responded by sending text messages to "winsorsmith" that read, "Yea that's the ppp they just got more funds for the EIDL grants and loan" and "I haven't seen or heard nothing about ppl doing the EIDL getting in trouble".

12

24. Upon further review of the Cellebrite report from the iPhone seized from Lawhorn, I observed a string of text messages from the TextNow app between the user of the iPhone and the phone number 773-310-1865 on July 2, 2020 that read as follows:

    a. The TextNow user "winsorsmith" sent a text message to the phone number 773-310-1865 that contained a screen shot of a notice that was sent from the SBA followed by a text message that read, "What does this mean?".

    b. The user of the phone number 773-310-1865 responded to "winsorsmith" by sending a text message that read, "Idk my brother girl got the same email".

25. Upon further review of the Cellebrite report from the iPhone seized from Lawhorn, I observed a string of text messages from the TextNow app between the user of the iPhone and the phone number 773-310-1865 on July 10, 2020 that read as follows:

    a. The TextNow user "winsorsmith" sent a text message to the phone number 773-310-1865 that read, "Noneeee of the accounts have hit whyyyy?".

    b. The user of the phone number 773-310-1865 responded to "winsorsmith" by sending text messages that read, "I heard a lot of bank is rejecting them" and "Some ppl I know check hit and the bank sent it back after the sba verified it (emoji) that come from ppl talking to much and now the banks know what they doing".

    c. The TextNow user "winsorsmith" sent a text message to the phone number 773-310-1865 that read, "Wowwww. So I'd it burnt up or do you think our others wil come. How can the bank reject something ?"

    d. The user of the phone number 773-310-1865 responded to "winsorsmith" by sending text messages that read, "Idk they froze this guy account and said they sending it back to sba, sba told them it's a grant and they can't send it back, the

13

bank said If he don't bring proof of his business then they're not releasing the funds how is they asking for proof if sba didn't plus verified that they sent the check and it belongs to him. Some bank just on some b.s. not sure of all banks but he had Chase. One of My friends just came after a month. She with Bank of America." And "But when I call sba will let me know if it was sent or not".

    e. The TextNow user "winsorsmith" responded to the phone number 773-310-1865 by sending a text message that read, "Ok call and check".

26.     Upon further review of the Cellebrite report from the iPhone seized from Lawhorn, I observed a string of text messages from the TextNow app between the user of the iPhone and the phone number 773-310-1865 on July 15, 2020 that read as follows:

    a. The user of the phone number 773-310-1865 sent text messages to "winsorsmith" that read, "They sent Marquez a loan denial letter. Abt to send it, read the part I circled" and "I put basically the same info/numbers on everybody application so that can't be the reason they denied it (emoji) IDK".

27.     A federal grand jury subpoena was obtained that was issued to the U.S. Small Business Administration (SBA) to obtain all information related to the submissions of Economic Injury Disaster Loan Advances for Lawrence Lawhorn, Latoya Brown, Lauren Luque, Marquez Lawhorn, Tiera Wallace, Kathy Kimhang, Matthew Akins, and Michael Stapleton and reviewed the subpoena compliance received. According to a review of the information received from the SBA, the following applications were submitted with the corresponding actions:

    a. On June 23, 2020, an EIDL application requesting an advance was submitted to the SBA for a sole proprietor with a business legal name of "Lawrence Lawhorn" who reportedly had a construction and contractor business that had been in operation

14

since February 18, 2016 and employed ten (10) employees as of January 31, 2020. The loan application was submitted through the IP address 2604:2d80:4d8f:2100:197:ea9a:d73b:310e. An EIDL Advance was granted in the amount of $10,000.

b. On June 24, 2020, an EIDL application requesting an advance was submitted to the SBA for a sole proprietor with a business legal name of "Latoya Brown" who reportedly had a catering business that had been in operation since February 4, 2019 and employed ten (10) employees as of January 31, 2020. The loan application was submitted through the IP address 2604:2d80:4d8f:2100:40f:6f84:f27e:766d. An EIDL Advance was granted in the amount of $10,000.

c. On June 25, 2020, an EIDL application requesting an advance was submitted to the SBA for a sole proprietor with a business legal name of "Lauren Luque" who reportedly had a catering business that had been in operation since March 5, 2018 and employed ten (10) employees as of January 31, 2020. The loan application was submitted through the IP address 2604:2d80:4d8f:2100:4c0c:7b21:d291:735d. An EIDL Advance was granted in the amount of $10,000.

d. On July 1, 2020, an EIDL application requesting an advance was submitted to the SBA for a sole proprietor with a business legal name of "Marquez Lawhorn" who reportedly had a catering business that had been in operation since February 1, 2019 and employed ten (10) employees as of January 31, 2020. The loan application was submitted through the IP address 2604:2d80:4d8f:2100:9d21:b4a0:bc91:fd36. An EIDL was denied so no funds were disbursed.

e. On June 23, 2020, an EIDL application requesting an advance was submitted to the SBA for a sole proprietor with a business legal name of "Michael Stapleton" who reportedly had a maid and cleaning service business that had been in operation since April 2, 2019 and employed ten (10) employees as of January 31, 2020. The loan application was submitted through the IP address 2604:2d80:4d8f:2100:197:ea9a:d73b:310e. An EIDL was denied so no funds were disbursed.

f. On June 24, 2020, an EIDL application requesting an advance was submitted to the SBA for a sole proprietor with a business legal name of "Kathy Kimhang" who reportedly had a hair and nail salon business that had been in operation since September 10, 2018 and employed ten (10) employees as of January 31, 2020. The loan application was submitted through the IP address 2604:2d80:4d8f:2100:78d1:f797:b350:678b. An EIDL was denied so no funds were disbursed.

g. On June 24, 2020, an EIDL application requesting an advance was submitted to the SBA for a sole proprietor with a business legal name of "Tiera Wallace" who reportedly had a catering business that had been in operation since June 3, 2019 and employed ten (10) employees as of January 31, 2020. The loan application was submitted through the IP address 2604:2d80:4d8f:2100:a8c6:8269:a7c9:561d. An EIDL was denied so no funds were disbursed.

28. A federal grand jury subpoena was obtained that was issued to Mediacom for the subscriber information for the IP addresses listed in paragraph 27. According to a review of the documentation provided by Mediacom, the IP address 2604:2d80:4d8f:2100 was assigned to an

16

account in the name of Tina Plant, 2615 Old 63 S, Columbia, Missouri, telephone number 773-310-1865 from April 22, 2020 through September 9, 2020. Tina Plant is Battie's maiden name.

29. Searches were conducted on the Missouri Secretary of State's website in the business search portal for businesses in the names of the businesses who submitted EIDL applications to the SBA described in paragraph 27. However, no businesses were registered with the State of Missouri Secretary of State's Office under those names.

30. A federal grand jury subpoena was obtained for the Bank of America account in the name of Lawrence Lawhorn, account number ending in 6872. According to a review of the bank account records, the bank account was opened on June 17, 2020 and Lawhorn was the only account owner. A $10,000 deposit was made into the account by SBAD TREAS 310 on June 25, 2020. On July 13, 2020, a teller cash withdrawal was made from the bank account in the amount of $8,150. The remainder of the funds were debit card and ATM transactions. The account balance was $213 on July 23, 2020.

31. A federal grand jury subpoena was obtained for the BMO Harris bank account in the name of Latoya Brown, account number ending in 7440. According to a review of the bank account records, a $10,000 deposit was made into the account by SBAD TREAS 310 on June 25, 2020. On June 30, 2020 and July 1, 2020, withdrawals were made from Brown's bank account totaling $5,000 which were CashApp transfers to the CashApp account in the name of Tina Battie. On June 30, 2020 and July 1, 2020, withdrawals were made from Brown's bank account totaling $3,000 which were CashApp transfers to the CashApp account titled "Apple".

32. A federal grand jury subpoena was obtained for the CashApp accounts utilized by Tina Battie, Latoya Brown, and Lauren Luque. Luque's CashApp account received the $3,000 transfers from Latoya Brown that are described in paragraph 31 that were transferred to "Apple".

17

33.     A federal grand jury subpoena was obtained for the Bank of America bank account in the name of Lauren Luque and another individual, account number ending in 2210.  According to a review of the bank account records, a $10,000 deposit was made into the account by SBAD TREAS 310 on June 30, 2020.  The bank account also received the two transfers from Brown via the CashApp.  On July 6, 2020, a $2,000 withdrawal was made from Luque's Bank of America bank account to CashApp to pay Tina Battie.  On July 6, 2020, a transfer was made from Luque's Bank of America bank account to United Credit Union in the amount of $12,151.  According to the Bank of America bank records, payroll deposits were regularly deposited into Luque's bank account from "Missouri Cardiov".

34.     A federal grand jury subpoena was obtained for Luque's bank account at United Credit Union, account number ending in 6604.  According to a review of the bank records, a $5,000 withdrawal was made from this bank account on July 3, 2020 and a $3,000 withdrawal was made from this bank account on July 10, 2020.  This bank account had a balance of $2.46 prior to the transfer of money into it from Luque's Bank of America bank account and it had a balance of $9.47 on July 21, 2020.

35.     A grand jury subpoena was obtained for A1 Empire Inc.'s Bank of America bank account.  In review of the documents provided by Bank of America, Battie is the only signatory on the account.   In review, the statements showed deposits into that account from Battie's Cash App account around the time she received money from Luque and Brown's Cash App accounts.  I also observed deposits into the A1 Empire Inc.'s Bank of America bank account via Zelle.  Zelle is a United States–based digital payments network which enables individuals to electronically transfer money from their bank account to another registered user's bank account (within the United States) using a mobile device or the website of a participating banking institution.  In review

18

of the text messages found on Lawhorn's iPhone, I observed a text message between Battie and Lawhorn in which she told him to set up a Zelle account.

36.     On January 27, 2022, I submitted a preservation request to Instagram through the Facebook (Meta) Law Enforcement Online Requests System for the Target Account.

37.     Based upon the information contained in the paragraphs above, I believe there is probable cause that Tina Battie, the owner of a credit repair business named A1 Empire Inc., utilized the phone number 773-310-1865 to communicate with Lawhorn to submit fraudulent EIDL applications requesting advances for Lawhorn and his friends and family members and that Battie was paid for submitting the fraudulent applications. Additionally, I believe that Battie obtained or attempted to obtain EIDL advances for other individuals based upon comments that were made in the text messages between Battie and Lawhorn detailed in the paragraphs above. On April 4, 2020, Battie advertised on the Target Account that the SBA was taking applications for COVID-19 Economic Injury Disaster Loans. I know from my training and experience that individuals utilize direct messaging within Instagram to communicate with each other and I believe that the Target Account contains evidence of wire fraud related to the submission of fraudulent COVID-19 Economic Injury Disaster Loan applications.

## **BACKGROUND CONCERNING INSTAGRAM** [1]

38.     Instagram is a service owned by Meta, a United States company and a provider of an electronic communications service as defined by 18 U.S.C. §§ 3127(1) and 2510. Specifically, Instagram is a free-access social networking service, accessible through its website and its mobile

---

[1] The information in this section is based on my training and experience, and on information published by Meta on its website and its Instagram website, including, but not limited to, the following webpages: "Data Policy," available at https://help.instagram.com/519522125107875; "Information for Law Enforcement," available at https://help.instagram.com/494561080557017; and "Help Center," available at https://help.instagram.com.

application, that allows subscribers to acquire and use Instagram accounts, like the target account(s) listed in Attachment A, through which users can share messages, multimedia, and other information with other Instagram users and the general public.

39.     Meta collects basic contact and personal identifying information from users during the Instagram registration process.  This information, which can later be changed by the user, may include the user's full name, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, credit card or bank account number, and other personal identifiers.  Meta keeps records of changes made to this information.

40.     Meta also collects and retains information about how each user accesses and uses Instagram.  This includes information about the Internet Protocol ("IP") addresses used to create and use an account, unique identifiers and other information about devices and web browsers used to access an account, and session times and durations.

41.     Each Instagram account is identified by a unique username chosen by the user.  Users can change their usernames whenever they choose but no two users can have the same usernames at the same time.  Instagram users can create multiple accounts and, if "added" to the primary account, can switch between the associated accounts on a device without having to repeatedly log-in and log-out.

42.     Instagram users can also connect their Instagram and Meta accounts to utilize certain cross-platform features, and multiple Instagram accounts can be connected to a single Meta account.  Instagram accounts can also be connected to certain third-party websites and mobile apps for similar functionality.  For example, an Instagram user can "tweet" an image uploaded to Instagram to a connected Twitter account or post it to a connected Meta account, or transfer an image from Instagram to a connected image printing service.  Meta maintains records of changed

20

Instagram usernames, associated Instagram accounts, and previous and current connections with accounts on Meta and third-party websites and mobile apps.

43. Instagram users can "follow" other users to receive updates about their posts and to gain access that might otherwise be restricted by privacy settings (for example, users can choose whether their posts are visible to anyone or only to their followers). Users can also "block" other users from viewing their posts and searching for their account, "mute" users to avoid seeing their posts, and "restrict" users to hide certain activity and prescreen their comments. Instagram also allows users to create a "close friends list" for targeting certain communications and activities to a subset of followers.

44. Users have several ways to search for friends and associates to follow on Instagram, such as by allowing Meta to access the contact lists on their devices to identify which contacts are Instagram users. Meta retains this contact data unless deleted by the user and periodically syncs with the user's devices to capture changes and additions. Users can similarly allow Meta to search an associated Meta account for friends who are also Instagram users. Users can also manually search for friends or associates.

45. Each Instagram user has a profile page where certain content they create and share ("posts") can be viewed either by the general public or only the user's followers, depending on privacy settings. Users can customize their profile by adding their name, a photo, a short biography ("Bio"), and a website address.

46. One of Instagram's primary features is the ability to create, edit, share, and interact with photos and short videos. Users can upload photos or videos taken with or stored on their devices, to which they can apply filters and other visual effects, add a caption, enter the usernames of other users ("tag"), or add a location. These appear as posts on the user's profile. Users can

21

remove posts from their profiles by deleting or archiving them. Archived posts can be reposted because, unlike deleted posts, they remain on Meta's servers.

47.     Users can interact with posts by liking them, adding or replying to comments, or sharing them within or outside of Instagram. Users receive notification when they are tagged in a post by its creator or mentioned in a comment (users can "mention" others by adding their username to a comment followed by "@"). An Instagram post created by one user may appear on the profiles or feeds of other users depending on a number of factors, including privacy settings and which users were tagged or mentioned.

48.     An Instagram "story" is similar to a post but can be viewed by other users for only 24 hours. Stories are automatically saved to the creator's "Stories Archive" and remain on Meta's servers unless manually deleted. The usernames of those who viewed a story are visible to the story's creator until 48 hours after the story was posted.

49.     Instagram allows users to broadcast live video from their profiles. Viewers can like and add comments to the video while it is live, but the video and any user interactions are removed from Instagram upon completion unless the creator chooses to send the video to IGTV, Instagram's long-form video app.

50.     Instagram Direct, Instagram's messaging service, allows users to send private messages to select individuals or groups. These messages may include text, photos, videos, posts, videos, profiles, and other information. Participants to a group conversation can name the group and send invitations to others to join. Instagram users can send individual or group messages with "disappearing" photos or videos that can only be viewed by recipients once or twice, depending on settings. Senders can't view their disappearing messages after they are sent but do have access to each message's status, which indicates whether it was delivered, opened, or replayed, and if the

recipient took a screenshot. Instagram Direct also enables users to video chat with each other directly or in groups.

51.     Instagram offers services such as Instagram Checkout and Meta Pay for users to make purchases, donate money, and conduct other financial transactions within the Instagram platform as well as on Meta and other associated websites and apps. Instagram collects and retains payment information, billing records, and transactional and other information when these services are utilized.

52.     Instagram has a search function which allows users to search for accounts by username, user activity by location, and user activity by hashtag. Hashtags, which are topical words or phrases preceded by a hash sign (#), can be added to posts to make them more easily searchable and can be "followed" to generate related updates from Instagram. Meta retains records of a user's search history and followed hashtags.

53.     Meta collects and retains location information relating to the use of an Instagram account, including user-entered location tags and location information used by Meta to personalize and target advertisements.

54.     Meta uses information it gathers from its platforms and other sources about the demographics, interests, actions, and connections of its users to select and personalize ads, offers, and other sponsored content. Meta maintains related records for Instagram users, including information about their perceived ad topic preferences, interactions with ads, and advertising identifiers. This data can provide insights into a user's identity and activities, and it can also reveal potential sources of additional evidence.

55.     In some cases, Instagram users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other

23

users.  Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

56.     For each Instagram user, Meta collects and retains the content and other records described above, sometimes even after it is changed by the user (including usernames, phone numbers, email addresses, full names, privacy settings, email addresses, and profile bios and links).

57.     In my training and experience, evidence of who was using Instagram and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above.  This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.  In my training and experience, it is likely that the user of the Target Account will have communicated with other Instagram users through direct messages regarding posts that were made, including the post dated April 4, 2020 wherein the user of the Target Account posted for people to "GO APPLY NOW" for COVID-19 Economic Injury Disaster Loans.

58.     Based on my training and experience, instant messages, emails, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.  Thus, stored communications and files connected to an Instagram account may provide direct evidence of the offenses under investigation, and can also lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

59.     In addition, the user's account activity, logs, stored electronic communications, and other data retained by Meta can indicate who has used or controlled the Instagram account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geolocation, date and time) may be evidence of who used or controlled the account at a relevant time, and device identifiers and IP addresses can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

60.     Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (*e.g.*, information indicating a plan to commit a crime), or consciousness of guilt (*e.g.*, deleting account information in an effort to conceal evidence from law enforcement).

61.     Other information connected to the use of an account may lead to the discovery of additional evidence. For example, accounts are often assigned or associated with additional identifiers such as account numbers, advertising IDs, cookies, and third-party platform subscriber identities. This information may help establish attribution, identify and link criminal activity across platforms, and reveal additional sources of evidence.

62.     Therefore, Meta's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Instagram. In my training and experience,

such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## CONCLUSION

63.     Based on the forgoing, I request that the Court issue the proposed search warrant.

64.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving the warrant on Meta. Because the warrant will be served on Meta, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

65.     The facts set forth in this affidavit are true and correct to the best of my knowledge and belief.

Further, Affiant sayeth not.

**Stacy R. Banks**
Special Agent
Federal Bureau of Investigation

Sworn to and subscribed by me on this, the 7th day of February, 2022(via telephone).

**Willie J. Epps, Jr.**
United States Magistrate Judge

26